# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

CITIMORTGAGE, INC.,                    )
                                       )
                Plaintiff,             )     Case No.: 2:13-cv-02039-GMN-VCF
        vs.                            )
                                       )     **ORDER**
COUNTRY GARDENS OWNERS'                )
ASSOCIATION; ALESSI & KOENIG, LLC;     )
and DOES 1 through 20, inclusive,      )
                                       )
                Defendants.            )
_____)

        Pending before the Court is the Motion for Preliminary Injunction (ECF No. 3) filed by Plaintiff CitiMortgage, Inc. ("Plaintiff").  Defendant Alessi & Koenig filed a Response (ECF No. 14) and Plaintiff filed a Reply (ECF No. 15).

## I.      BACKGROUND

        Plaintiff alleges that it is "the servicer for the beneficial interest holder of the first Deed of Trust encumbering" the real property known as 5320 Mum Court, North Las Vegas, Nevada 89031 ("Subject Property"). (Compl. ¶¶ 2, 8.)  Plaintiff further alleges that Defendant Country Gardens Owners' Association ("Country Gardens HOA") "is claiming an interest in the Subject Property pursuant to a Notice of Delinquent Assessment (Lien) ("HOA Lien") recorded on March 27, 2013 . . .." (Compl. ¶ 11.)  On May 6, 2013, Defendant "Alessi & Koenig as trustee for Country Gardens HOA recorded a Notice of Default and Election to Sell Under Homeowners Association Lien ("Notice of Default") . . .."  (Compl. ¶ 12.)  Subsequently, on October 10, 2013, "Alessi & Koenig, again on behalf of Country Gardens HOA, recorded a Notice of Trustee's Sale ("Notice of Sale") on the Subject Property" in which Alessi & Koenig "claimed the Subject Property would be sold at public auction on November 6, 2013, at 2:00

p.m. unless Alessi & Koenig received payment of $4,649.07." (Compl. ¶ 14.)  Despite sending Alessi & Koenig a letter requesting that "Alessi & Koenig provide notice regarding any potential sale of the Subject Property," Plaintiff never received such notice and only became aware of the Notice of Sale on October 24, 2013. (Compl. ¶¶ 15-16.)

Plaintiff attempted to prevent the Trustee's Sale by sending a letter to Alessi & Koenig on November 1, 2013 in which Plaintiff offered "to remit payment in the amount of $495.00 for payment in full of the super-priority portion of the HOA Lien.  The amount represented nine (9) months' worth of monthly assessments charged by Country Gardens HOA . . .." (Compl. ¶ 17.) Nevertheless,  Alessi & Koenig refused to postpone the foreclosure sale. (Compl. ¶ 19.)

In response, Plaintiff filed the instant action seeking a declaration that "(a) A prior-recorded first security interest recorded on the Subject Property is not affected by a homeowners association foreclosure sale conducted pursuant to NRS 116.3116, et seq.; and (b) Any purchaser at the Country Gardens HOA foreclosure sale, conducted pursuant to NRS 116.3116 et seq., takes the Subject Property subject to the Plaintiff's prior-recorded first security interest." (Compl. ¶ 22.)  Alternatively, Plaintiff seeks a declaration that

(a) The super-priority portion of the HOA Lien is limited to an amount equal to nine (9) months of regular monthly assessments that would have become due immediately preceding the recording of the Notice of Default plus any charges allowed by NRS 116.310312 (if applicable);

(b) The super-priority portion of the HOA Lien does not include any amount(s) for any fine, penalty, late charge(s), interest, or costs of collecting;

(c) Plaintiff's payment of the nine (9) months of regular monthly assessments that would have come due immediately preceding the notice of delinquent assessment (or for applicable charges allowed by NRS 116.310312) relieves the HOA Lien of any priority over a prior-recorded first security interest;

(d) Defendants are required to identify the amount of its alleged super-priority lien to Plaintiff, and to provide an accounting to illustrate how this amount was calculated; and

(e) Defendants are not permitted to conduct the [November 6, 2013 Trustee's Sale], unless and until Defendants provide Plaintiff with the amount of the alleged super-priority lien, in accordance with Nevada law, an illustration of how this amount was calculated, and allow Plaintiff a reasonable amount of time to remit payment.

(Compl. ¶ 23.)

In addition, Plaintiff filed a Motion for Temporary Restraining Order seeking to enjoin the November 6, 2013 Trustee's Sale (ECF No. 3), which the Court previously granted (ECF No. 4).  In Plaintiff's Motion for Temporary Restraining Order, Plaintiff is also sought a preliminary injunction to enjoin the sale until after the Court decides the merits of this declaratory judgment action. (ECF No. 3.)  The Court held a hearing on Plaintiff's Motion for Preliminary Injunction on November 21, 2013 at which the Court GRANTED Plaintiff's Motion. (*See* Minutes of Proceedings, ECF No. 17.)  This written order follows.

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 65 governs preliminary injunctions and authorizes a court to "issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1).  A preliminary injunction may be issued if a plaintiff establishes: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 22.

The Ninth Circuit has held that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

"In deciding a motion for a preliminary injunction, the district court 'is not bound to decide doubtful and difficult questions of law or disputed questions of fact.'" *Int'l. Molders' & Allied Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) (quoting *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964)).

"The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (citing 11 C. Wright and A. Miller, *Federal Practice and Procedure, Civil*, § 2949 at 471 (1973)).

## III.   <u>DISCUSSION</u>

In this case, the Court finds that Plaintiff has met its burden under *Alliance for the Wild Rockies v. Cottrell* and that a preliminary injunction is necessary in this case to maintain the status quo through the pendency of this action.

### A.   **Strong Questions Going to the Merits**

Plaintiff's seeks a declaration that, even if a portion of the section 116.3116 HOA lien has priority over the first recorded Deed of Trust, the portion of this super priority lien is limited to the amount of nine months of monthly assessments exclusive of any costs, fees, penalties, etc. Defendant asserts that the amount of this priority lien is not limited to the nine months of assessments, but also includes a variety of costs, penalties, and fees. In contrast, Plaintiff contends that the words of the statute limit the amount of any priority lien to solely nine months of monthly assessments. Specifically, section 116.3116 of the Nevada Revised Statutes expressly provides that an HOA's lien is prior to a first security interest on the unit, "to the extent of the assessments for common expenses based on the periodic budged adopted by the association pursuant to NRS 116.3115 which would have become due in the absence of

acceleration during the 9 months immediately preceding institution of an action to enforce the lien . . .."  Based on the language of the statute, the Court finds strong questions going to the merits of Plaintiff's declaratory judgment action, namely, the amount that Plaintiff would need to pay in order to satisfy any portion of the lien that is senior to Plaintiff's Deed of Trust.

Furthermore, it appears that Defendants may have failed to comply with the notice requirements in sections 116.31162–116.31168 of the Nevada Revised Statutes.  For example, the HOA must mail a notice of default and election to sell, within ten days after the notice is recorded to "[e]ach person who has requested notice pursuant to NRS 107.090 or 116.31168" and "[a]ny holder of a recorded security interest encumbering the unit's owner's interest who has notified the association, 30 days before the recordation of the notice of default, of the existence of the security interest . . .." Nev. Rev. Stat. 116.31163.  In addition, section 116.311635 requires that the HOA give notice of the time and place of the sale by mailing a copy of the Notice of Sale to "[t]he holder of a recorded security interest or the purchaser of the unit, if either of them has notified the association, before the mailing of the notice of the sale, of the existence of the security interest . . .." Nev. Rev. Stat. 116.311635(1)(b)(2).  Nevertheless, Plaintiff alleges that Defendants failed to provide the requested notice regarding the sale of the Subject Property. (Compl. ¶ 15.)

Finally, given the varying interpretations that the Nevada state courts and the judges of this district have given this statute, the Court finds strong questions going to the merits of Plaintiff's request for a declaration that a first recorded Deed of Trust is not extinguished when an HOA forecloses on an HOA lien. *Compare SFR Investments Pool 1, LLC v. Wells Fargo Bank, N.A.*, No. 2:13-cv-01153-APG-PAL (D. Nev. July 25, 2013) (concluding that the HOA had established a likelihood of succeeding on the merits of its claim that foreclosure of the super priority portion of the HOA lien extinguished a first recorded Deed of Trust) (attached as Exhibit 1), *and First 100, LLC v. Burns*, No. A677693 (8th Judicial D. Ct. Clark Cnty., Nev.

May 30, 2013) (concluding that, pursuant to Chapter 116 of the Nevada Revised Statutes, the non-judicial foreclosure of an HOA lien extinguishes prior recorded security interests) (attached as Exhibit 2), *with Bayview Loan Servicing, LLC v. Alessi & Koenig, LLC*, No. 2:13-cv-00164-RCJ-NJK, 2013 WL 2460452 (D. Nev. June 6, 2013) (granting summary judgment in favor of lender's assignee and holding that the foreclosure of an HOA lien did not extinguish the first mortgage) (attached as Exhibit 3).

For these reasons, the Court finds strong questions going to the merits of Plaintiff's cause of action.

### B.    Likelihood of Irreparable Harm

To carry its burden, Plaintiff must also establish that it will likely suffer irreparable harm without the issuance of injunctive relief. *Winter*, 555 U.S. at 21.  Plaintiff must "demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief." *Id.*  At bottom, Plaintiff must show that "remedies available at law, such as monetary damages, are inadequate to compensate for th[e] injury." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Without the requested injunction, Defendants will likely sell the property at a Trustee's Sale.  Given the uncertainty in the law, Plaintiff will suffer irreparable harm if the courts determine that Defendants' foreclosure extinguishes their interest, especially given that the exact calculation of this super priority lien is also unsettled.

### C.    Balance of Equities Tips Sharply Toward Plaintiff

The balance of equities tips sharply in favor of Plaintiff because, without this injunction, the HOA may sell the property and this sale may extinguish Plaintiff's interest before the Court resolves the merits of Plaintiff's declaratory judgment action.

### D.    Public Interest

"The public interest analysis for the issuance of [injunctive relief] requires [district

courts] to consider whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) (citation omitted).  In this case, the Court finds no reason that the public interest would be harmed by the issuance of the requested injunction.  Accordingly, the lack of harm to the public interest also supports Plaintiffs' requested relief.

## IV.    **BOND**

Rule 65(c) of the Federal Rules of Civil Procedure requires that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully . . . restrained." Fed. R. Civ. P. 65(c).  Thus, the primary purpose of such a bond is to safeguard Defendants from costs and damages incurred as a result of a preliminary injunction improvidently issued.

The Court finds that a bond in an amount equal to the nine months priority lien amount is appropriate.  Accordingly, this preliminary injunction will go into effect upon Plaintiff's posting a bond in the amount of $495.00.

## V.    **CONCLUSION**

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Preliminary Injunction (ECF No. 3) is **GRANTED.**

**DATED** this 5th day of December, 2013.

_____
Gloria M. Navarro
United States District Judge

# Exhibit 1

1

2 **UNITED STATES DISTRICT COURT**

3 **DISTRICT OF NEVADA**

4

5 SFR INVESTMENTS POOL 1, LLC, a
Nevada limited liability company,

Case No. 2:13-cv-01153-APG-PAL

6 Plaintiff,

7 vs. **ORDER GRANTING PRELIMINARY INJUNCTION**

8 WELLS FARGO BANK, N.A., a national
association; JOSEPH A. HOLMES, an
9 individual; SONJA J. PALMER, an
individual; and DOES I through X; and ROE
10 CORPORATIONS I through X, inclusive,

11
Defendants.

12

13

14 Plaintiff's motion for preliminary injunction was heard on July 23, 2013 at 2:00 p.m.

15 Diana S. Cline, Esq. and Jacqueline A. Gilbert of Howard Kim  & Associates appeared on

16 behalf of Plaintiff SFR Investments Pool 1, LLC ("SFR").  Chelsea A. Crowton, Esq. of Wright

17 Finlay & Zak LLP appeared on behalf of Defendant Wells Fargo Bank, N.A. ("Wells Fargo").

18 The court has considered the motion, the pleadings and papers on file herein, and the arguments

of counsel.

19
The court hereby finds that SFR has met its burden for injunctive relief.  Plaintiff has a

20 substantial likelihood of success on the merits and will suffer irreparable harm if Wells Fargo

21 continues with the non-judicial foreclosure proceedings before the conclusion of this litigation.

22
Before Wells Fargo filed its notice of removal, Plaintiff filed an application for

23 temporary restraining order and motion for preliminary injunction, seeking to enjoin Defendant

24 Wells Fargo, its successors, assigns and agents from continuing foreclosure proceedings, selling,

25 transferring, or otherwise conveying the real property commonly known as **2650 Upland Bluff**

26 **Drive, Las Vegas, NV 89142 Parcel No. 161-11-112-032** (the "Property").  On July 10, 2013,

27

28

1  this Court issued a temporary restraining order enjoining the trustee's sale scheduled for Friday,

2  July 12, 2013 and required Plaintiff to post a $5,000 bond.

3        Plaintiff acquired title to the Property through a quit claim deed dated March 6, 2013

4  from Sunrise Highlands Community Association (the "Association").     According to a

5  foreclosure deed recorded on February 14, 2013, the Association acquired title to the Property

6  on June 27, 2012 at a publicly-held foreclosure auction pursuant to the powers conferred by the

7  Nevada Revised Statutes 116 *et seq.* and a Notice of Delinquent Assessment (Lien), recorded on

8  November 24, 2010.

9        Defendants Joseph A. Holmes and Sonja J. Palmer obtained title to the Property in

10  August of 2007 through a Grant, Bargain, Sale Deed. On August 10, 2007, Wells Fargo

11  recorded a deed of trust against the Property to secure a loan to Holmes and Palmer ("Deed of

12  Trust").  A Notice of Default and Election to Sell pursuant to the terms of Deed of Trust was

13  recorded on December 10, 2012. A Notice of Sale pursuant to the terms of the Deed of Trust

14  was recorded on June 11, 2013.

15        Plaintiff argues that Wells Fargo's foreclosure of its Deed of Trust is improper because

16  the July 27, 2013 foreclosure of the Association's lien containing super priority amounts

17  extinguished the Deed of Trust.   Wells Fargo argues that NRS 116.3116(2) establishes a

18  "payment priority" that requires payment to the Association if a first security interest forecloses,

19  but does not give the Association the ability to extinguish a first security interest through

20  foreclosure of an Association's lien.

21        The court finds that NRS 116.3116 is clear, not ambiguous; therefore, the court need not

22  look to the legislative history to interpret the statute.[1]  Under NRS 116.3116(1), the Association

23  has a lien on the Property for amounts including delinquent assessments. Pursuant to NRS

24  116.3116(4),  the  recording  of  the  Association's  declaration  of  covenants,  conditions  and

25

26  [1]  Even if the court were to consider legislative history and other sources, the result would be the
same.  The court has considered the May 30, 2013 order issued by the Honorable Judge Jerome
27  Tao in *First 100, LLC v. Burns, et al*, (Eighth Judicial District Court Case No. A-13-677693-C),
which contains a detailed analysis of NRS 116.3116.  The Court finds Judge Tao's analysis in
28  that order persuasive.

1  restrictions on August 1, 2006 constituted perfection and record notice of the Association's lien.

2  NRS 116.3116(2) provides that the entire Association Lien

3      is prior to all other liens and encumbrances of unit except:

4      (a) Liens and encumbrances recorded before the recordation of the declaration
       and, in a cooperative, liens and encumbrances which the association creates,
5      assumes or takes subject to;
       (b) A first security interest on the unit recorded before the date on which the
6      assessment sought to be enforced became delinquent or, in a cooperative, the first
       security interest encumbering only the unit's owner's interest and perfected before
7      the date on which the assessment sought to be enforced became delinquent; and
       (c) Liens for real estate taxes and other governmental assessments or charges
8      against the unit or cooperative.

9      NRS 116.3116(2) further provides that a portion of the Association Lien has priority over

10  a first security interest in the Property:

11      [the Association Lien] is also prior to all security interests described in paragraph
       (b) to the extent of any charges incurred by the association on a unit pursuant to
12      NRS 116.310312 and to the extent of the assessments for common expenses
       based on the periodic budget adopted by the association pursuant to NRS
13      116.3115 which would have become due in the absence of acceleration during the
       9 months immediately preceding institution of an action to enforce the lien[.]
14
       The Association may foreclose on its lien, including the portion of its lien that has
15
    priority over a first security interest, through the procedures outlined in NRS 116.31162 through
16
    NRS 116.31168.
17
       In this case, the Deed of Trust held by Wells Fargo is inferior to any super priority
18
    portion of the Association's lien.  Therefore, the proper foreclosure of the Association's lien
19
    containing super priority amounts would have extinguished the Deed of Trust. Accordingly,
20
    Plaintiff has demonstrated a likelihood of success on the merits.
21
       It is up to the Nevada Legislature, not this court, to decide whether the statutory scheme
22
    that allows a homeowners association lien to have priority over a first security interest is sound
23
    public policy.  This court's obligation is to enforce the law as written, absent some statutory or
24
    constitutional infirmity.
25
       IT IS HEREBY ORDERED that Defendant Wells Fargo Bank, N.A. and its agents are
26
    restrained and enjoined from continuing with foreclosure proceedings regarding (and from
27
    selling, transferring, or otherwise conveying) the real property commonly known as **2650**
28

1  **Upland Bluff Drive, Las Vegas, NV 89142 Parcel No. 161-11-112-032** (the "Property") until

2  the conclusion of this litigation or further order of this court.

3      IT IS FURTHER ORDERED that the $5,000.00 bond posted by Plaintiff on July 11,

4  2013 as security for the temporary restraining order issued by this court on July 10, 2013 shall

5  remain in place as security for this preliminary injunction. Plaintiff also shall post an additional

6  security bond in the amount of $500.00 per month for each month that this injunction remains in

7  place. The parties may stipulate to have the bond amounts deposited into an interest-bearing

8  escrow or similar account, rather than into the court.

9      IT IS FURTHER ORDERED that Plaintiff shall maintain the Property including, but not

10  limited to, paying all homeowners association assessments and taxes, and carrying hazard

11  insurance in an appropriate amount. Plaintiff shall disclose to Wells Fargo the amount and

12  coverage of that insurance. If, during the litigation, Wells Fargo believes the Property is not

13  being properly maintained or protected, or that an additional bond amount is needed, it may seek

14  appropriate relief from this court.

15      Dated this 25th day of July, 2013 at 8:15 a.m.

16

17                       UNITED STATES DISTRICT JUDGE

18

19

20                    .

21

22

23

24

25

26

27

28

# Exhibit 2

Electronically Filed
05/31/2013 08:50:14 AM

ORDD

CLERK OF THE COURT

DISTRICT COURT

CLARK COUNTY, NEVADA

FIRST 100, LLC,

                    Plaintiff,

v.

RONALD BURNS, et al.,

                    Defendants.

CASE NO.: A677693
DEPARTMENT NO. XX

**ORDER DENYING
DEFENDANT'S MOTION
TO DISMISS**

This matter having come on for hearing on the 8th day of May, 2013; Luis A. Ayon, Esq., and Margaret E. Schmidt, Esq., appearing for and on behalf of Plaintiff; Chelsea A. Crowton, Esq., appearing for and on behalf of Defendant, U.S. Bank; Karl L. Nielson, Esq., appearing for and on behalf of Defendant, Ronald Burns; Gregory L. Wilde, Esq., appearing for and on behalf of Defendant, National Default Servicing Corporation; and the Court having hearing arguments of counsel, and being fully advised in the premises, finds:

(1)    This matter comes before the Court on a Motion by Defendant U.S. Bank NA to dismiss the Complaint pursuant to Rule 12(b)(5) of the Nevada Rules of Civil Procedure ("NRCP").

(2)    This dispute arises from foreclosure proceedings conducted against a residential property located at 3055 Key Largo Drive, Unit #101, Las Vegas, Nevada 89120, identified by APN 162-25-614-153 ("the Subject Property"). The Subject

1   Property is located within a common-interest community governed by a homeowners'
2   association as defined in NRS Chapter 116, known as the Canyon Willows Owners
3   Association (HOA).  The prior owners of the property (who are not parties to this
4   action) failed to pay all monthly assessments due under the operating documents of the
5   common-interest community.  In response, the HOA asserted a lien against the Subject
6   Property and initiated foreclosure proceedings pursuant to NRS 116.3116 et seq. which
7   culminated in a foreclosure sale conducted on February 2, 2013.

8       (3)   The Plaintiff is First 100 LLC, a Nevada limited-liability corporation,
9   which alleges that it acquired the Subject Property at the February 2, 2013 public
10  auction.  According to the allegations of the Complaint, the Plaintiff properly recorded
11  a Deed on February 4, 2013 reflecting its purchase of the Subject Property.  However,
12  two days later, on February 6, 2013, the Subject Property was re-sold by way of
13  foreclosure and Trustee's Sale initiated by Defendant National Default Servicing
14  Corporation, who asserted that it was the named trustee under Deed of Trust previously
15  recorded against the Subject Property on October 30, 2006, as Instrument No.
16  200610300002548 (and referred to in the pleadings as the "BNC Mortgage Deed of
17  Trust").  Defendant Robert Burns purchased the Subject Property at the February 6,
18  2013 Trustee's Sale.

19      (4)   The Plaintiff's Complaint asserts three causes of action: (First) Wrongful
20  Foreclosure against Defendant National Default Servicing Corporation; (Second)
21  Declaratory Relief/Quiet Title against all Defendants; and (Third) Injunctive Relief
22  against Defendant Burns.

23      (5)   As framed by the parties' briefing and oral arguments, the issue before the
24  Court is a straightforward question of law.  The Plaintiff contends that the February 2
25  foreclosure sale conducted pursuant to NRS 116.3116 et seq. and based upon a lien
26  asserted by a homeowner's association for unpaid assessments automatically
27  extinguished, by operation of law, any and all prior encumbrances upon the Subject
28  Property.  Thus, according to the Plaintiff, the subsequent Trustee's Sale conducted on

JEROME M. MO
DISTRICT JUDGE
DEPARTMENT XX

2

February 6 was unlawful because the October 30, 2006 Deed of Trust against the Subject Property had been extinguished in its entirety by the February 2 foreclosure sale. Therefore, the Plaintiff alleges that it is the rightful and legal owner of the Subject Property via its purchase of the Subject Property on February 2 free and clear of all prior encumbrances.

(6)     In considering a Motion to Dismiss pursuant to NRCP 12(b)(5), the Court must accept all factual allegations of the pleadings to be true and view those allegations both liberally and in the light most favorable to the non-moving party. However, the Court need not accept the parties' assertions of law as true. The Court's analysis is limited to the factual allegations contained within the four corners of the Complaint and all inferences reasonably arising therefrom. A claim can only be dismissed if it is clear beyond any reasonable doubt that the plaintiff cannot prove any set of facts at trial that would entitle it to relief. Furthermore, a complaint can be dismissed even if all of the elements of a cause of action have been technically pled so long as the Court, relying on "judicial experience and common sense," finds that the allegations of the complaint are "conclusory" or "implausible." *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009)[1].

(7)     In this case, the parties do not appear to dispute that the February 2, 2013 foreclosure sale was properly conducted in accordance with all of the legal requirements of NRS Chapter 116. The parties also do not appear to dispute that the BNC Mortgage Deed of Trust was a perfected legal encumbrance upon the Subject Property properly recorded on October 30, 2006. The parties also do not appear to dispute that the lien asserted against the Subject Property by the HOA was proper and legal under the provisions of NRS Chapter 116. The parties also do not appear to dispute that, if the Plaintiff's interpretation of the legal consequences of NRS Chapter 116 is correct, the Plaintiff has properly pled the elements supporting its causes of

---

[1] *Ashcroft* was decided pursuant to FRCP 12(b)(6). However, where the Nevada Rules of Civil Procedure parallel the Federal Rules of Civil Procedure, rulings of federal courts interpreting and applying the federal rules are persuasive authority for this Court in applying the Nevada Rules. *E.g., Executive Management Ltd. v. Ticor Title Ins.,* 118 Nev. 46, 53 (2002). NRCP 12(b)(5) is identical to FRCP 12(b)(6).

1 action.

2     (8)    Therefore, the question before the Court is a straightforward question of

3 statutory interpretation: whether a foreclosure sale properly initiated and conducted

4 pursuant to NRS Chapter 116 automatically extinguishes all prior encumbrances on the

5 property such that a bona fide purchaser at the foreclosure sale acquires the property

6 free and clear of all prior encumbrances.

7     (9)    In interpreting the scope and meaning of a statute, the Court looks first to

8 the words of the statute. The words of a statute are assigned their ordinary meaning

9 unless it is clear from the face of the statute that the Legislature intended otherwise.

10 When "the language of a statute is plain and unmistakable, there is no room for

11 construction, and the courts are not permitted to search for its meaning beyond the

12 statute itself." *Estate of Smith v. Mahoney's Silver Nugget*, 127 Nev. Adv. Op. 76

13 (November 23, 2011). If the Legislature has independently defined any word or phrase

14 contained within a statute, the Court must apply the definition created by the

15 Legislature. If, and only if, the Court determines that the words of the statute are

16 ambiguous when given their ordinary and plain meaning, then reference may be made

17 to other sources such as the legislative history of the statute in order to clarify the

18 ambiguity. An "ambiguity" exists where a provision is susceptible to two reasonable

19 interpretations.

20     (10)   A threshold question in this case is whether the security interest

21 represented by the BNC Mortgage Deed of Trust is senior or junior to the lien asserted

22 by the HOA. NRS 116.3116 states in part as follows:

23         2.    A lien under this section is prior to all other liens and
encumbrances on a unit except...
24         (b)    A first security interest on the unit recorded before the date on
25         which the assessment sought to be enforced became delinquent or, in a
cooperative, the first security interest encumbering only the unit's
26         owner's interest and perfected before the date on which the assessment
27         sought to be enforced became delinquent....

28

↳ The lien is also prior to all security interests described in paragraph (b) to the extent of...the assessments for common expenses based on the periodic budget adopted by the association pursuant to NRS 116.3115 which would have become due in the absence of acceleration during the 9 months immediately preceding institution of an action to enforce the lien, unless federal regulations adopted by the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association require a shorter period of priority for the lien. If federal regulations adopted by the Federal Home Loan Mortgage Corporation or the Federal National Mortgage Association require a shorter period of priority for the lien, the period during which the lien is prior to all security interests described in paragraph (b) must be determined in accordance with those federal regulations, except that notwithstanding the provisions of the federal regulations, the period of priority for the lien must not be less than the 6 months immediately preceding institution of an action to enforce the lien. This subsection does not affect the priority of mechanics' or materialmen's liens, or the priority of liens for other assessments made by the association.

(11)   Thus, under NRS 116.3116, a previously perfected first security interest retains its seniority over a subsequent lien asserted by a homeowners' association *except* to the extent that the subsequent association lien is based upon unpaid regular periodic assessments for common expenses.  In that event, notwithstanding that the association's lien was asserted subsequently in time, a portion of the homeowners' association lien (limited to what was unpaid during the nine months immediately preceding the lien) is given artificial priority over a previously perfected first security interest.  The portion of the association lien equating to what was unpaid during those nine months is commonly said to have "super-priority" status over other prior encumbrances.  If the association claims that more than nine months' assessments stand unpaid, then the amount unpaid during the nine months immediately preceding the lien is entitled to "super priority" status over other encumbrances, but any assessments remaining unpaid for more than nine months would be subordinate to other previously perfected encumbrances.

(12)   The parties do not appear to dispute that the lien asserted by the HOA in this case was based upon regular periodic assessments that were unpaid during the nine

months immediately preceding the imposition of the lien. Therefore, as a matter of law, the lien asserted by the HOA is deemed to be senior to the security interest created by the BNC Mortgage Deed of Trust even though the HOA lien was asserted subsequently in time. The parties do not appear to dispute this legal conclusion.

(13) Thus, the parties appear to agree that the HOA lien was senior to the BNC Mortgage Deed of Trust at the instant in time immediately before the property was sold via foreclosure sale to the Plaintiff on February 2, 2013. However, what the parties vigorously dispute is whether the junior security interest (the BNC Mortgage Deed of Trust) was extinguished by operation of law as a result of the February 2 foreclosure sale.

(14) NRS 116.31162 states that, after a lien is asserted by a homeowner's association and certain procedures are followed, the association "may foreclose its lien by sale." If the association chooses to proceed with a non-judicial foreclosure sale, then NRS 116.31164 governs how the foreclosure sale is to occur. After the foreclosure sale is completed, NRS 116.31164 governs how the proceeds of the sale must be allocated. In particular, NRS 116.31164(3) states:

3.   After the sale, the person conducting the sale shall....
(c)   Apply the proceeds of the sale for the following purposes in the following order:
(1)   The reasonable expenses of sale;
(2)   The reasonable expenses of securing possession before sale, holding, maintaining, and preparing the unit for sale, including payment of taxes and other governmental charges, premiums on hazard and liability insurance, and, to the extent provided for by the declaration, reasonable attorney's fees and other legal expenses incurred by the association;
(3)   Satisfaction of the association's lien;
(4)   Satisfaction in the order of priority of any subordinate claim of record; and
(5)   Remittance of any excess to the unit's owner.

(15) Thus, the plain language of NRS 116.31164 expressly contemplates that the proceeds must first used to pay the expenses of the sale, taxes and other governmental charges, legal expenses, and the association's lien, and then to satisfy

1  "subordinate claim[s] of record."

2      (16)   In this case, the parties agree that the proceeds of the sale totaled only

3  approximately $2,000.00, far less than what would have been required to pay off all of

4  the liens and security interests that existed against the Subject Property prior to the

5  foreclosure sale. Accordingly, the question before the Court can be phrased as follows:

6  when the proceeds from a foreclosure sale conducted pursuant to NRS 116.31164 are

7  inadequate to satisfy all of the various lienholders when distributed as required in NRS

8  116.31164(3), does the failure to satisfy the subordinate interests mean that those

9  subordinate interests survive the foreclosure sale to the extent that they remain

10 unsatisfied, or instead that those subordinate interests are extinguished by operation of

11 law such that a bona fide third-party purchaser at the foreclosure sale takes the property

12 free and clear of any unsatisfied subordinate encumbrances?

13     (17)   The Plaintiff avers that the latter case is true. Consequently, the Plaintiff

14 asserts that because all subordinate interests were extinguished on February 2 when it

15 acquired the Subject Property, the subsequent foreclosure sale conducted on February 6

16 based upon an unpaid subordinate security interest was unlawful. On the other hand,

17 the Defendant avers that the former must be true. Consequently, the Defendant avers

18 that its subordinate security interest survived the February 2 sale because the interest

19 remained unsatisfied from the proceeds of that sale, and accordingly it possessed the

20 legal right to foreclose upon the Subject Property and trigger a second foreclosure sale

21 in order to satisfy its subordinate interests. In effect, the Defendant argues that the

22 Plaintiff, by purchasing the Subject Property for an amount insufficient to pay off all

23 existing encumbrances, only acquired the property "subject to" those unsatisfied

24 encumbrances.

25     (18)   The Court has reviewed the entirety of NRS Chapter 116, and there

26 appears to be no statutory provision that expressly states that an unsatisfied junior lien

27 either is, or is not, extinguished by operation of law as a consequence of a foreclosure

28 sale conducted pursuant to NRS 116.31164. In their briefs, the parties are also unable

to identify any particular provision expressly on point. Therefore, in analyzing the answer to this question, the Court must consider other sources, such as the legislative history of NRS 116.31164, and other similar statutes contained within the NRS.

(19)    NRS Chapter 116 was originally introduced in 1991 as Assembly Bill 221, with the stated purpose of "adopt[ing] the Uniform Common-Interest Ownership Act," or UCIOA  (Preamble of AB 221, introduced January 24, 1991; statement of introduction of AB 221, Minutes of the Assembly Committee on Judiciary, February 20, 1991). At the time, the UCIOA had already been adopted in several other states and was under consideration in at least 3 others. (Memorandum dated March 13, 1991 from Uniform Common Interest Ownership Act Subcommittee, in the legislative record as an exhibit to Minutes of the Assembly Committee on Judiciary, March 20, 1991). NRS 116.3116 originally corresponded to Section 100 of AB 221, and NRS 116.31164 originally corresponded to Section 102 of AB 221. The "super priority" lien verbiage included within Section 100 of AB 221 is identical to NRS 116.3116 as it exists today, except that the original "super priority" lien was limited to assessments unpaid during the six months (rather than 9 months) immediately preceding the lien. The time period was expanded to nine months in 2009 by Assembly Bill 204.

(20)    NRS 116.3116 was subjected to various technical amendments in 1993 through AB 612 (which did not affect the "super priority" language at issue here). During testimony in support of the technical amendments, one of the drafters of the original bill testified that:

> "As a general proposition, it makes good sense to follow a uniform law as closely as possible, utilizing the optional suggestions in the uniform act to customize the law as necessary. The corresponding benefit -- especially important in a small state like Nevada -- is our own version of a uniform law with precedent in other uniform law jurisdictions. Maintaining the uniform law also makes available the very helpful explanatory comments, some of which contain illustrative examples, and all of which, like the act itself, represent not only very careful draftsmanship, but the input of all of the different groups involved in the homeowner association process; that is, developers, consumers, lenders, local governmental authorities, state regulators, managers and other

professionals, as well as homeowners associations themselves." (Testimony of Michael Buckley, Chairman of the Uniform Common-Interest Ownership Act Subcommittee, before the Assembly Judiciary Committee on May 20, 1993).

(21)    Thus, one of the principal drafters of the bill expressly urged that the Nevada Legislature adhere as closely as practicable to the uniform version of the UCIOA, and the Nevada Legislature did so by enacting the "super priority" language originally included in the UCIOA into NRS 116.3116 without any amendment (and with virtually no debate). Consequently, the legislative history surrounding AB 221 contains virtually nothing useful to the Court's analysis in the case at hand. However, the Legislature apparently contemplated that adoption of the uniform language without amendment would enable Nevada courts to look to "precedent in other uniform law jurisdictions" as well as the background and explanatory comments accompanying the UCIOA in resolving questions relating to the scope and meaning of NRS 116.3116.

(22)    Indeed, the Nevada Supreme Court regularly looks outside the confines of NRS Chapter 116 and to the Uniform Act (as well as other sources) in interpreting various provisions of NRS Chapter 116. *E.g.*, *Holcomb Condominium HOA v. Stewart Venture LLC*, 129 Nev. Adv. Op. 18 (April 4, 2013) ("the term 'separate instrument' is not defined in NRS Chapter 116 or the Uniform Common-Interest Ownership Act (UCIOA)"); *Beazer Homes Holding Corp. v. District Court*, 128 Nev. Adv. Op. 66 (Dec. 27, 2012) (citing "the commentary to the Restatement (Third) of Property, section 6.11, which mirrors section 3–102 of the Uniform Common Interest Ownership Act, upon which NRS 116.3102 is based"); *Boulder Oaks Community Association v. B&J Andrews*, 169 P.3d 1155 (2007) (unpublished) ("NRS Chapter 116 is Nevada's version of the Uniform Common-Interest Ownership Act and largely mirrors the uniform act [and citing to] the commentary to [the UCIOA]").

(23)    NRS 116.3116 is modeled upon Section 3-116 of the 1982 version of the UCIOA, which was originally drafted by the National Conference of Commissioners on Uniform State Laws. NRS 116.3116 deviates from Section 3-116 in expanding the period of "super priority" to include unpaid assessments occurring during the preceding

9 months instead of merely 6 months, but otherwise NRS 116.3116 is identical to UCIOA Section 3-116.

(24)   Official Comment 1 to Section 3-116 describes the purpose of the section as follows:

> "To ensure prompt and efficient enforcement of the association's lien for unpaid assessments, such liens should enjoy statutory priority over most other liens. ... A significant departure from existing practice, the 6 months' priority for the assessment lien strikes an equitable balance between the need to enforce collection of unpaid assessments and the obvious necessity of protecting the priority of the security interests of lenders. As a practical matter, mortgage lenders will most likely pay the 6 months' assessments demanded by the association rather than having the association foreclose on the unit. If the lender wishes, an escrow for assessments can be required. Since this provision may conflict with the provision of some state statutes which forbid some lending institutions from making loans not secured by first priority liens [state law should be consulted]."

(25)   Thus, the drafters of the UCIOA expressly contemplated that, as a practical matter in most cases, the holder of the first security interest would seek to protect its interest from subordination to a "super priority" lien by simply paying the unpaid assessments. However, the Comment does not expressly specify whether, if a lender chooses not to do so and instead permits the property to proceed to foreclosure, the lender's first security interest is thereby extinguished. Furthermore, nothing else in either the plain text or comments of UCIOA appear to relate specifically to the question of whether a foreclosure sale initiated due to unpaid assessments extinguishes all other junior liens, including a first security interest rendered junior because of the "super priority" provision. Quite to the contrary. Comment 1 suggests that the drafters of the UCIOA intended to leave this question to state law rather than establishing uniform national standards.

(26)   In Opposition to the Motion, the Plaintiff notes that, as a general principle of Nevada law, foreclosure of a superior security interest extinguishes all junior interests that did not participate in the foreclosure process. *E.g.*, *Brunzell v.*

*Lawyers Title Ins. Co.*, 101 Nev. 395 (1985); *Erickson Construction Co. v. Nevada National Bank*, 89 Nev. 350 (1973). The Plaintiff also notes that the Nevada Department of Business and Industry has issued an administrative opinion, dated December 12, 2012, that interprets NRS Chapter 116.3116 such that a foreclosure based upon a "super priority" lien extinguished a first security interest made junior only due to the "super priority" statute. The Plaintiff also cites to an opinion by a Washington State appellate court (interpreting a statute identical to the UCIOA) finding that a foreclosure based upon a "super priority" lien extinguished a first security interest that was given notice of the pending foreclosure and yet chose not to participate. *Summerhill Village HOA v. Roughly*, 270 P.2d 639 (Wash.Ct.App. 2012). The Plaintiff also notes that some Judges of this Judicial District have resolved this question in favor of the Plaintiff's argument. The Court also notes that at least one scholarly commentator has opined that a non-judicial foreclosure sale under the UCIOA extinguishes all junior liens that did not participate in the foreclosure process as "necessary parties." *See*, Winokur, "Meaner Lienor Community Associations: The 'Super Priority' Lien and Related Reforms Under The UCIOA," 27 Wake Forest Law Review 353, 378 n.106 (1992) ("foreclosure extinguish[es] the Less-Prioritized Lien").

(27) In support of its Motion, the Defendant cites to an opinion issued by Judge Dawson of the U.S. District Court, *Diakonos Holdings LLC v. Countrywide Home Loans*, 2013 WL 531092 (D.Nev. February 11, 2013), rejecting the reasoning of the Washington court in *Summerhill*. The Defendant also cites to various unpublished, non-precedential Orders issued by other Judges of this Judicial District that have found that a foreclosure sale based upon a "super priority" lien does not extinguish a first security interest upon the property. (*See*, Defendant's Motion, pages 11-14).

(28) In short, the situation before this Court appears to be as follows. By this Motion, this Court is asked to interpret the scope and meaning of a statute that was enacted by the Nevada Legislature after virtually no meaningful debate, that was modeled on a broad uniform act that specifically left unanswered the question raised by

this Motion, whose legislative sponsor urged the Legislature not to deviate from the text of the uniform act so that the courts of this State could rely upon precedent from other states, and upon which the courts of different states, and the Judges of this Judicial District, have taken different positions.

(29)   In the absence of clear guidance from the text of the statute or its legislative history, this Court is left to examine other sources for guidance.  One such source consists of other statutes that relate to matters similar to those addressed by NRS 116.3116.

(30)   In Nevada, holders of security interests against real property may initiate foreclosure through multiple statutory avenues.  For example, the holder of a mortgage may initiate a judicial foreclosure via NRS 40.430 et seq.  The holder of a deed of trust may also initiate a non-judicial foreclosure (commonly known as a "Trustee's Sale") pursuant to NRS 107.080 et seq.  A landlord (or other assignee of the right to receive rent from real property) may also seek the appointment of a receiver to initiate a foreclosure upon a security instrument pursuant to NRS 107A.260.

(31)   It is well-settled that any foreclosure sale conducted pursuant to NRS 40.462, 107.080, or 107A.260 automatically extinguishes all junior security interests against the property.  *E.g.*, *Brunzell v. Lawyers Title Ins. Co.*, 101 Nev. 395 (1985); *Erickson Construction Co. v. Nevada National Bank*, 89 Nev. 350 (1973).  Thus, the Defendant is essentially arguing that a foreclosure conducted pursuant to NRS 116.3116 is something wholly unique under Nevada law, because it would represent the only type of foreclosure permitted in Nevada under which junior liens would not be automatically extinguished.

(32)   However, if the Defendant is correct that foreclosures conducted pursuant to NRS 116.3116 are unique under Nevada law, then there must exist something in the text or legislative history of NRS 116.3116 that says so.  Under settled rules of statutory interpretation, the Court cannot read NRS 116.3116 as a unique, unprecedented, and *sui generis* departure from long-established norms relating to

foreclosure sales in Nevada unless there is some indication in the text or legislative history that the Legislature intended this to be the case. There is not. Quite to the contrary, the complete absence of anything within NRS Chapter 116 regarding the question of extinguishment suggests that the Legislature intended that Chapter 116 foreclosures would be handled as any other type of foreclosure.

(33)   Notably, NRS 40.462 was enacted in 1989, and NRS 107.080 was originally enacted in 1927. In other words, both NRS 40.462 and 107.080 pre-date the enactment of NRS 116.3116, as does the opinion of the Nevada Supreme Court in *Erickson Construction Co. v. Nevada National Bank*, 89 Nev. 350 (1973) (holding that non-judicial foreclosure sales automatically extinguish junior liens). Thus, the Legislature must be presumed to have known when NRS 116.3116 was enacted that the normal consequence of a foreclosure sale in Nevada would be that all junior liens are automatically extinguished. Had the Legislature intended that NRS 116.3116 represent a singular departure from established legal norms, the Legislature certainly could have included language to that effect. The Court notes that the Legislature utilizes a variety of common phrases throughout the NRS when it intends to create exceptions to other statutes; *see, for example*, NRS 78.090(1) ("Notwithstanding the provisions of NRS 77.300..."); NRS 62B.390(1) ("Except as otherwise provided in NRS 62B.400..."); NRS 62E.010(2) ("Except as otherwise provided by specific statute...."); NRS 78.120(1) ("Subject only to such limitations as may be provided by this chapter..."); NRS 48.025 ("All relevant evidence is admissible, except as otherwise provided by this title..."); NRS 51.075(2) ("The provisions of NRS 51.085 to 51.305, inclusive, are...not restrictive of the exception provided by this section"). Yet none of these phrases are contained anywhere within NRS Chapter 116 in any context that suggests an intention to depart from the ordinary rule that, in Nevada, foreclosure sales extinguish junior liens. The absence of any language to this effect suggests that this was not the intention of the Legislature.

(34)    Moreover, NRS 116.3116 et seq. contains a series of specific departures and deviations from the foreclosure proceedings established in NRS 40.462 and 107.080, but none that relate to the extinguishment or non-extinguishment of junior liens. For example, the idea of "super priority" exists nowhere in NRS Chapter 40 or 107. Similarly, neither NRS 40.462 nor 107.080 include the kinds of specific notice provisions required by NRS Chapter 116 before a foreclosure sale can be initiated. Yet the Legislature included no language in NRS 116.3116 that can be read as departing from the principle of extinguishment. It is well-settled that the inclusion of one thing must be read as the implying the omission of another (*"expressio unius est exclusio alterius"*). Thus, when the Legislature chose to include language designed to deviate in certain specific ways from established foreclosure practices, but not language that changes whether junior liens are extinguished, that choice must be deemed by this Court to have been intentional and deliberate.

(35)    Furthermore, not only did the Legislature include no language departing from the principle of extinguishment under NRS Chapter 40 and 107, it included language in NRS Chapter 116 highly similar to language contained in NRS Chapter 107 that expressly recites that junior liens are extinguished. NRS 107.080(5) recites that a Trustee's Sale "vests in the purchaser the title of the grantor...without equity or right of redemption." NRS 116.31166(3) recites that a foreclosure sale initiated pursuant to NRS 116.3116 "vests in the purchaser the title of the unit's owner without equity or right of redemption." This similarity suggests that the Legislature intended that a purchaser at a NRS Chapter 116 foreclosure sale acquires exactly the same title as he would have acquired had the foreclosure been a NRS Chapter 107 Trustee's Sale, i.e., title free and clear of junior encumbrances. Moreover, the words "without equity or right of redemption" were defined long ago by the Nevada Supreme Court, which held that a sale "without equity or right of redemption" is one that vests the purchaser with "absolute legal title as complete, perfect and indefeasible as can exist...and a sale, upon due notice to the mortgagor, whether at public or private sale, forecloses all

JEROME TAO
DISTRICT JUDGE
DEPARTMENT XX

equity of redemption as completely as a decree of court." *Bryant v. Carson River Lumbering Co.*, 3 Nev. 313, 317-18 (1867), quoted in *In re Grant*, 303 B.R. 205, 209 (Bankr.D.Nev. 2003).

(36)    Thus, the operation of NRS 116.3116 appears to be as follows.  NRS 116.316 creates a series of specific and unique requirements when an HOA imposes a lien against a property and wishes to initiate a foreclosure sale to satisfy unpaid assessments.  Where NRC Chapter 116 is silent, the Court must presume that the Legislature intended that the ordinary and established principles governing the conduct of foreclosure sales in Nevada apply to "fill in the gaps."

(37)    Accordingly, when a homeowners' association imposes a lien for unpaid assessments, a portion of the unpaid assessments (not exceeding nine months) are entitled to "super priority" status over existing liens and mortgages.  NRS 116.3116(2).  However, in order to perfect this "super priority" lien, the association must give proper notice to all parties including any holders of first security interests whose priority will have been adversely affected.  NRS 116.31163(2).  Furthermore, if the association wishes to foreclose upon the property in order to satisfy its lien, it may do so, but only after given specific notice to all subordinate lienholders of record.  NRS 116.311635(1)(a)(2).  As expressly contemplated by Comment 1 to UCIOA Section 3-116, most subordinate lienholders would likely protect their interest from extinguishment by simply paying off the unpaid assessments.  Indeed, that appears to be the specific purpose of requiring that those lienholders be given notice under NRS 116.31163(2) and NRS 116.311635(1)(a)(2).  But if those subordinate lienholders fail to stave off foreclosure by paying off the assessment, then their subordinate claims are paid off with any surplus proceeds of the foreclosure sale.  NRS 116.31164(3)(c)(4).  After the sale is completed, any subordinate claims are automatically extinguished by operation of law.  *Erickson Construction Co. v. Nevada National Bank*, 89 Nev. 350 (1973) (holding that non-judicial foreclosure sales automatically extinguish junior liens).  If the lender's mortgage remains unsatisfied after the foreclosure sale, it may be

able to pursue a deficiency action against the mortgagor of record (the original defaulting party), but not any claim against the property itself or against new bona fide third-party who purchased the property at the foreclosure sale.

(38)   In their briefs, both parties advance various policy and "fairness" arguments in support of their respective positions. For example, the Defendant argues that permitting a bona-fide third-party purchaser to procure a property for a mere $2,000 while extinguishing a mortgage worth many times that amount is "unfair". However, any junior lienholder has a simple remedy for this unfairness -- as expressly contemplated by Comment 1 to UCIOA Section 3-116, a lender can avoid foreclosure and protect its interest from extinguishment by simply intervening to pay off the assessments.

(39)   Moreover, the Court notes that the Defendant's argument would lead to an equally "unfair" result. In this case, if the Defendant's argument were adopted, then the net result would be that the Plaintiff will have paid $2,000 to satisfy the association's lien, yet does not own the Subject Property. In effect, the Plaintiff paid off the lien asserted by the HOA and acquired nothing in return, because immediately after it acquired the Subject Property, the property was taken by the Defendant and sold to someone else for more money. This result appears fundamentally unfair to bona fide third-party purchasers who will have paid off the assessments that the lender failed to pay despite having been given specific notice of the existence of the unpaid assessments, and despite the obvious intent of the drafters of the UCIOA that, in most cases, the lender would protect its own interest by paying off the assessments. This result would achieve the perverse outcome of actually rewarding sloth and inaction on the part of the lender, who, as expressly recognized by Comment 1 to UCIOA Section 3-116, is the one party (other than the defaulting owner) in a position to stop the foreclosure, protect its own interests, and make the association whole by paying the assessments. Instead, the Defendant's interpretation of NRS 116.3116 would result in the association and the lender being made whole at the expense of bona fide third-party

JEROME TAO
DISTRICT JUDGE
DEPARTMENT XX

1  purchasers, a result that is quite obviously absurd.

2      (40)   The Defendant appears to suggest this outcome, however unfair, is the
3  natural consequence of the fact that the Plaintiff attempted to purchase the Subject
4  Property for less than the cumulative total of all existing encumbrances upon the
5  Subject Property, and "buyer beware" because, had the Plaintiff properly done its
6  homework, it should have known that it might stand to lose the Subject Property unless
7  it purchased the Subject Property for an amount sufficient to pay off all existing liens.

8      (41)   But, as noted, the party best-positioned to protect its interests (and
9  incidentally to protect any innocent third parties) is the lender whose interests are
10  directly at stake. It is a well-recognized principle of Nevada law that when both
11  potential interpretations of a statute or rule are unfair to someone, the brunt of any
12  unfairness should not fall on innocent third parties. *E.g., NC-DSH Inc. v. Garner*, 125
13  Nev. 647, 656 (2009) (in choosing who should suffer from the fraudulent actions of an
14  agent, "ordinarily, the sins of an agent are visited upon his principal, not the innocent
15  third party with whom the dishonest agent dealt"); *Rothman v. Fillette*, 469 A.2d 543,
16  545 (Pa. 1983) (cited approvingly in *NC-DSH Inc. v. Garner*, 125 Nev. 647, 656
17  (2009)) ("a principal acting through an agent in dealing with an innocent third party
18  must bear the consequences of the agent's fraud" because of "the long recognized
19  principle that where one of two innocent persons must suffer because of the fraud of a
20  third...the loss should be borne by him who put the wrongdoer in a position of trust and
21  confidence and thus enabled him to perpetrate the wrong"). *See also, Tri-County*
22  *Equipment & Leasing v. Klinke*, 128 Nev. Adv. Op. 33 (June 28, 2012) (Gibbons, J.,
23  concurring) (when one party is likely to receive a windfall, it should be the party who
24  lacks any responsibility for the situation) (relevant citations omitted). In this case, it is
25  true that the lender cannot be said to bear responsibility for the non-payment of
26  assessments by the record owner. However, the lender is in a far better position to
27  protect its interests, make the association whole, and eliminate the need for foreclosure
28  than a third-party purchaser at the foreclosure sale with no connection to the lender, the

HOA, or the previous owner.  Yet, accepting the Defendant's argument in this case would result in the Plaintiff being the only party who suffers any monetary loss from the non-payment of assessments, as both the HOA and the Defendant have been made whole.  That result is fundamentally unfair and could not have been what the Legislature intended.

(42)   In a sense, this outcome can be seen as unfair to the lender whose interest in this case was extinguished by the purchase of the Subject Property for a mere $2,000.  However, Comment 1 to UCIOA Section 3-116 proposes two simple solutions.  First, the lender (having been given specific notice of the association's "super priority" lien) can protect its interest by paying the unpaid assessments before foreclosure is initiated by the association, thereby removing the "super priority" lien and ensuring that its security interest is the most senior one remaining.  Alternatively, and more proactively, as noted by Comment 1 the lender can ensure that there can never be a default or a "super priority" lien by simply impounding money in advance and paying the assessments itself, much as lenders now commonly impound money to pay tax bills in order to prevent tax liens and government tax foreclosures.  In either case, the association will have been made whole, thus accomplishing the fundamental purpose of NRS 116.3116, and the lender can seek to satisfy its own security by initiating its own foreclosure at which its security interest would be the most senior encumbrance.

(43)   In general, however, questions regarding the fairness of any public policy are for the Legislature to resolve, not for the Judiciary.  The Legislature is entitled to enact legislation that may, in some instances, be unfair to some parties.  But the Judiciary cannot substitute its own judgment for that of the Legislature and read a statute in a manner other than as it is drafted merely because the application of the statute might seem unwise.  In this case, the disposition of this Motion is based upon the application of clear principles of statutory interpretation.  In the complete absence of any language in NRS Chapter 116 reflecting a Legislative intent to depart from the

established principle that subordinate liens are extinguished by foreclosure sales, the Court must assume that the Legislature intended that Chapter 116 foreclosures operate precisely in the same manner.

(44)   For the foregoing reasons, the Defendant's Motion to Dismiss is DENIED.

DATED:  May 30, 2013

JEROME T. TAO
DISTRICT COURT JUDGE

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing, by mailing, by placing copies in the attorney folder's in the Clerk's Office or faxing as follows:

Luis A. Ayon, Esq., and Margaret E. Schmidt, Esq. - Via Facsimile: 792-9002
Karl L. Nielson, Esq. - Via Facsimile: 692-8099
Gregory L. Wilde, Esq. - Via Facsimile: 258-8787
Chelsea A. Crowton, Esq. - Via Facsimile: 946-1345

*Paula Walsh*

Paula Walsh, Executive Assistant

# Exhibit 3



✓ FILED ___ ENTERED
RECEIVED
SERVED ON
COUNSEL/PARTIES OF RECORD

JUN 06 2013

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

1

2

3

4                  **UNITED STATES DISTRICT COURT**

5                       **DISTRICT OF NEVADA**

6

7 BAYVIEW LOAN SERVICING, LLC,     )
                                      )

8             Plaintiff,                   )
                                      )        2:13-cv-00164-RCJ-NJK

9         vs.                              )
                                      )

10 ALESSI & KOENIG, LLC et al.,          )             **ORDER**
                                      )

11             Defendants.              )
                                      )

12         This quiet title action arises out of the foreclosure of a lien for delinquent homeowner's

13 association ("HOA") fees.  Pending before the Court are cross motions for summary judgment.

14 For the reasons given herein, the Court grants Plaintiff's motion and denies Defendant's.

15 **I.**      **FACTS AND PROCEDURAL HISTORY**

16         Third-party Defendant Jesus Simiano ("Borrower") gave Third-party Defendant Silver

17 State Financial Services ("Lender") a promissory note for $176,000, secured by a deed of trust

18 ("DOT"), to refinance real property located at 5124 Lost Canyon Dr., North Las Vegas, NV

19 89031 (the "Property"). (Compl. ¶ 9, Jan. 30, 2013, ECF No. 1; DOT 1–3, July 27, 2004, ECF

20 No. 1, at 9).  Mortgage Electronic Registration Systems, Inc. ("MERS") was the beneficiary of

21 the DOT and Lender's nominee for the purpose of transferring the beneficial interest in the

22 promissory note. (*See* DOT 1–3).  MERS later assigned both its own interest in the DOT and

23 Lender's interest in the promissory note to Plaintiff Bayview Loan Servicing, LLC ("Bayview").

24 (Compl. ¶ 10; *see* Assignment, Apr. 14, 2010, ECF No. 1, at 27).

25         Defendant Alessi & Koenig, LLC ("A&K") later caused to be recorded a Notice of

Delinquent Assessment (Lien) ("NODA") against the Property on behalf of Defendant Hometown Ovation Owners Association ("HOOA") based upon $3391.58 in delinquent fees, assessments, interest, late fees, service charges, and collection costs. (Compl. ¶ 13; *see* NODA, Feb. 6, 2012, ECF No. 1, at 29). A&K then caused to be recorded a Notice of Default and Election to Sell Under Homeowners Association Lien ("NOD") against the Property on behalf of HOOA, alleging a total of $3541.58 in delinquencies. (Compl. ¶ 14; *see* NOD, Mar. 12, 2012, ECF No. 1, at 31). A&K then caused to be recorded a Notice of Trustee's Sale ("NOS") as to the Property on behalf of HOOA, indicating a sale for December 5, 2012 based upon a total delinquency of $4386.06. (Compl. ¶ 15; *see* NOS, Oct. 22, 2012, ECF No. 1, at 33).

Bayview contacted A&K concerning the NOS, and A&K postponed the sale until January 16, 2013. (Compl. ¶ 16). Bayview alleges it tendered the full amount due to A&K several times before that date, but that A&K refused to accept payment. (*See id.* ¶¶ 17–18). A&K sold the Property at the instruction of HOOA at the January 16, 2013 foreclosure sale to Defendant SFR Investments Pool 1, LLC ("SFR Pool 1") or Defendant SFR Investments, LLC ("SFR") (collectively, "SFR Defendants") for approximately $10,000. (*Id.* ¶¶ 19, 22). SFR later contacted Bayview and communicated its position that the sale had extinguished Bayview's DOT. (*Id.* ¶ 23).

Bayview sued A&K, HOOA, and SFR Defendants in this Court on two causes of action: (1) Wrongful Foreclosure; and (2) Declaratory Relief.[1] A&K and HOOA jointly moved for defensive summary judgment against the wrongful foreclosure claim, and while that motion was pending, SFR Pool 1 filed its Answer, which included counterclaims and third-party claims for quiet title against Bayview, Borrower, and Lender. The Court granted the motion for summary

---

[1]The declaratory relief claim is essentially a quiet title claim. *See Kress v. Corey*, 189 P.2d 352, 364 (Nev. 1948). Plaintiff asks the Court to declare in the alternative that under state law the trustee's sale was void or that it did not extinguish the first mortgage. (*See id.* ¶¶ 34–36).

1  judgment as against the wrongful foreclosure claim. The parties have now moved for summary

2  judgment on their remaining quiet title claims.

3  **II.     LEGAL STANDARDS**

4          A court must grant summary judgment when "the movant shows that there is no genuine

5  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

6  Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v.*

7  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there

8  is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A

9  principal purpose of summary judgment is "to isolate and dispose of factually unsupported

10  claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In determining summary

11  judgment, a court uses a burden-shifting scheme:

12          When the party moving for summary judgment would bear the burden of proof at
        trial, it must come forward with evidence which would entitle it to a directed verdict
13          if the evidence went uncontroverted at trial. In such a case, the moving party has the
        initial burden of establishing the absence of a genuine issue of fact on each issue
14          material to its case.

15  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations

16  and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden

17  of proving the claim or defense, the moving party can meet its burden in two ways: (1) by

18  presenting evidence to negate an essential element of the nonmoving party's case; or (2) by

19  demonstrating that the nonmoving party failed to make a showing sufficient to establish an

20  element essential to that party's case on which that party will bear the burden of proof at trial. *See*

21  *Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary

22  judgment must be denied and the court need not consider the nonmoving party's evidence. *See*

23  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

24          If the moving party meets its initial burden, the burden then shifts to the opposing party to

25  establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

1   475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party

2   need not establish a material issue of fact conclusively in its favor. It is sufficient that "the

3   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

4   versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

5   626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment

6   by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d

7   1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and

8   allegations of the pleadings and set forth specific facts by producing competent evidence that

9   shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

10       At the summary judgment stage, a court's function is not to weigh the evidence and

11  determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477

12  U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are

13  to be drawn in his favor." *Id*. at 255. But if the evidence of the nonmoving party is merely

14  colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

15  **III.    ANALYSIS**

16       In Nevada, HOAs have immediate liens against real property when HOA assessments or

17  other costs against a unit become delinquent. *See* Nev. Rev. Stat. § 116.3116(1). Under Nevada

18  law, a lien for delinquent HOA assessments is not prior to "[a] first security interest on the unit

19  recorded before the date on which the assessment sought to be enforced became delinquent," *id.*

20  § 116.3116(2)(b), except:

21       *to the extent of* any charges incurred by the association on a unit pursuant to NRS
         116.310312 and *to the extent of* the assessments for common expenses based on the
22       periodic budget adopted by the association pursuant to NRS 116.3115 which would
         have become due in the absence of acceleration during the 9 months immediately
23       preceding institution of an action to enforce the lien . . . .

24

25

Page 4 of 13

1     *Id.* § 116.3116(2) (unnumbered paragraph following subsection (2)(c) (emphases added)).[2] In

2     other words, a first mortgage recorded before HOA assessments become delinquent is senior to

3     an HOA lien, except to the extent of nine months of regular HOA dues immediately preceding

4     the action to enforce the HOA lien and any HOA fees and costs related to exterior maintenance

5     of the unit at issue or the removal or abatement of a public nuisance related to the unit at issue.[3]

6     It seems clear that the super-priority amount is unextinguished by foreclosure of a first mortgage,

7     even if the first mortgage is otherwise senior under the first mortgage rule.   The question is

8     whether the foreclosure of an HOA lien including some super-priority amount extinguishes a first

9     mortgage that has benefit of the first mortgage rule.   The Court believes that the best

10    interpretation of the statutes is that it does not.

11         Bayview's interpretation of the statute, with which the Court agrees, is that the first

12    mortgage rule prevents a prior-recorded first mortgage from being extinguished by foreclosure of

13    an HOA lien that contains a super-priority amount.   Under this interpretation, an HOA lien

14    arising *before* a first mortgage is recorded is senior to the first mortgage in all traditional

15    respects, i.e., it survives a foreclosure of the first mortgage, and its own foreclosure extinguishes

16    the first mortgage.   But an HOA lien arising *after* a first mortgage is recorded operates

17    unorthodoxly in relation to traditional liens.   The super-priority amount is senior to an earlier-

18    recorded first mortgage in the sense that it must be satisfied before a first mortgage upon its own

19    foreclosure, but it is *in parity with* an earlier-recorded first mortgage with respect to

20

21        [2]Section 116.310312 concerns HOA fines and costs imposed when an HOA must maintain the exterior of a unit in accordance with the CC&R or remove or abate a public nuisance on the exterior of the unit where the unit owner has failed to do so. *See id.*

22    § 116.310312(2). Section 116.3115 governs regular HOA dues. *See id.* § 116.3115.

23        [3]The Court will refer to this amount as the "super-priority amount" and will refer to the section of the statute defining it as the "super-priority rule." The Court will refer to any excess

24    portion of an HOA lien, i.e., the total amount of a lien under subsection (1) minus the super-priority amount, as the "sub-priority amount." The Court will refer to subsection (2)(b) as the

25    "first mortgage rule."

1    extinguishment, i.e., the foreclosure of neither extinguishes the other.

2        In practice, two options present themselves under this theory when a first mortgage is

3    recorded before an HOA lien arises. First, an HOA may of course foreclose its lien under the

4    statutes so providing, but the first mortgagee's lien survives such a foreclosure, and the first

5    mortgagee may later foreclose against the buyer at the HOA foreclosure sale if that buyer (or

6    someone else) does not satisfy the first mortgage out of the proceeds of the HOA foreclosure sale

7    or otherwise. An HOA conducting a foreclosure sale will be made whole under the statute so

8    long as the super-priority amount is satisfied by the foreclosure sale price, and if an HOA's

9    foreclosure sale leaves some portion of its "super-priority" lien unsatisfied—which

10   circumstances are unlikely ever to occur—it must pursue the unit owner for the deficiency.

11   Second, a first mortgagee may foreclose while an HOA lien exists. In such a case, the super-

12   priority amount of the HOA lien survives foreclosure, and the HOA may later foreclose against

13   the buyer at the foreclosure sale if that buyer (or someone else) does not satisfy the super-priority

14   amount out of the proceeds of the foreclosure sale or otherwise. In either case, any sub-priority

15   amount of an HOA lien is extinguished along with any other junior liens. Those junior liens are

16   satisfied in sequence of priority out of the foreclosure proceeds after the lien upon which the

17   foreclosure was based is fully satisfied, and junior lien holders must pursue the defaulted party

18   for any deficiencies, if they can.

19       In summary, an HOA may effectively have two liens: a super-priority lien, and a sub-

20   priority lien. The foreclosure of neither a super-priority lien nor a first mortgage extinguishes the

21   other. They are in parity with one another in this regard. But a super-priority lien must be

22   satisfied first out of the proceeds of the foreclosure of a junior lien. It is "first amongst equals" in

23   this regard. The sub-priority lien, on the other hand, like any other junior lien, is extinguished by

24   the foreclosure of either the super-priority lien or the first mortgage.

25       Another court of this District recently ruled consistently with this interpretation, though

1   with less discussion. *See Diakonos Holdings, LLC v. Countrywide Home Loans*, No. 2:12-cv-

2   00949, 2013 WL 531092, at *2–3 (D. Nev. Feb. 11, 2013) (Dawson, J.) (ruling that the

3   foreclosure of an HOA lien containing a super-priority amount does not extinguish a first

4   mortgage protected by the first mortgage rule).  Moreover, the real estate community in Nevada

5   clearly understands the statutes to work the way the Court finds.  In the current real estate market

6   in Nevada, most homes sold at foreclosure are purchased by investors for cash in order to

7   renovate the homes and then resell them for a quick profit or rent them.  If investors believed that

8   HOA foreclosures extinguished first mortgages, homes sold at HOA foreclosure sales would sell

9   for significant fractions of their fair market value, not for the tiny fractions of their fair market

10  value approximating the HOA lien at which HOA-foreclosed homes invariably sell.  That

11  investors will not pay significant amounts, i.e. fair amounts, for HOA-foreclosed homes indicates

12  their perception that the first mortgage survives, preventing any profit through resale.  If the

13  actors in the real estate market in Nevada believed that an HOA foreclosure extinguished the first

14  mortgage, one would expect the Property here to have sold for something on the order of $80,000

15  (assuming the home is worth roughly half of the $176,000 for which Borrower refinanced it in

16  2004).  But the Property sold for a mere $10,000, only slightly more than HOOA's lien.  This

17  shows that the Nevada real estate community does not operate as if HOA foreclosures extinguish

18  first mortgages recorded before the HOA delinquency arises.

19          SFR Pool 1's interpretation of the statute is different.  Under its theory, the foreclosure

20  of HOOA's lien completely extinguished Bayview's first mortgage in the same way that the

21  foreclosure of a first mortgage extinguishes a second mortgage (although SFR Pool 1 presumably

22  agrees that Bayview was entitled after HOOA's foreclosure sale to satisfy its first mortgage out

23  of the proceeds after any super-priority amount was satisfied and before any sub-priority amount

24  was satisfied).  SFR Pool 1 argues that the foreclosure of an HOA lien that includes any super-

25  priority amount—and they always will, as the super-priority amount is defined—extinguishes a

1   first mortgage. Under this theory, an HOA may foreclose its lien, and the first mortgagee's lien

2   would not survive, though it would be entitled to satisfaction from the proceeds after the super-

3   priority amount is satisfied and before any sub-priority amount is satisfied. And a first

4   mortgagee could still foreclose the first mortgage while an HOA lien exists, but the super-priority

5   amount of the HOA lien would survive.

6        SFR Pool 1 argues that the Division of Real Estate has interpreted the statutes this way.

7   But a close look at the relevant document indicates no such authoritative interpretation.

8   *See* Dep't of Business and Indus., Real Estate Div., Adv. Op. No. 13-01 (Dec. 12, 2012). The

9   relevant advisory opinion answers three questions: (1) whether the super-priority amount

10   includes "costs of collecting" as defined under section 116.310313 (no); (2) whether the super-

11   priority amount may ever exceed nine months of regular dues plus removal, abatement, and

12   maintenance costs (no); and (3) whether an HOA must institute a "civil action" as defined under

13   Nevada Rules of Civil Procedure 2 and 3 to create the super-priority lien (no). There is *obiter*

14   *dicta* on page nine of the advisory opinion supporting SFR Pool 1's view. *See id.* at 9 ("The

15   ramifications of the super priority lien are significant in light of the fact that superior liens, when

16   foreclosed, remove all junior liens. An association can foreclose its super priority lien and the

17   first security interest holder will either pay the super priority lien amount or lose its security.").

18   The opinion quotes the comments to section 3-116 of the Uniform Act, noting that first

19   mortgagees will typically pay HOA liens rather than suffer foreclosure. But that says nothing of

20   extinguishment. A first mortgagee may pay an HOA lien rather than suffer foreclosure because it

21   will inevitably have to foreclose itself anyway and does not wish to experience the hassle of

22   waiting for the first foreclosure to be completed, or because it may wish to take a deed in lieu of

23   foreclosure or authorize a short sale, and those options would be frustrated by an intermittent

24   foreclosure by an HOA. A first mortgagee's practical desire to avoid an HOA foreclosure does

25   not necessarily imply that the first mortgagee thinks its security would be lost thereby. The Real

1   Estate Division engaged in no further statutory analysis. Its *obiter dicta* in an advisory opinion

2   directed to other issues is unpersuasive.

3       The Court rejects this reading of the statues. It is clear to the Court that the legislative

4   intent was to ensure that no matter which entity forecloses, an HOA will be made whole (up to a

5   limited amount), while also ensuring that first mortgagees who record their interest before notice

6   of any delinquencies giving rise to a super-priority lien do not lose their security. The Court does

7   not believe that the legislature intended the extreme result of extinguishment of a first mortgage

8   in any case where an HOA forecloses its own lien.

9       The Court agrees with Bayview that interpreting the statutes as SFR Pool 1 does reads the

10   first mortgage rule out of the statutes. The statute creating the HOA lien (subsection

11   116.3116(1)) is the rule. The first mortgage rule (subsection (2)(b)) is an exception to the rule.

12   The super-priority rule (the unnumbered paragraph following subsection (2)(c)) is an exception

13   to the exception. Because the exception to the exception here necessarily includes all instances

14   of the rule itself—there can be no subsection (1) lien that does not include some super-priority

15   amount, because that amount includes virtually every kind of assessment that could be

16   delinquent, except for collection fees and costs arising therefrom—the exception under

17   subsection (2)(b) would be totally subsumed by the exception to the exception, rendering it

18   meaningless if its operation were not limited in a way that permits the exception to have some

19   application. That is, in order to give each part of the statutes some effect, the Court must read

20   them together to mean that the super-priority rule affects the priority of reimbursement, but not

21   extinguishment. Reading the super-priority rule to affect extinguishment would read the first

22   mortgage rule out of the statutes almost entirely.

23       It is true that under SFR Pool 1's interpretation, the first mortgage rule would continue to

24   have effect in a limited class of cases when an HOA forecloses a lien containing some sub-

25   priority amount. In such cases, the first mortgage rule will still ensure that the first mortgage is

1   satisfied before the sub-priority amount of the HOA lien, giving the first mortgage rule some

2   effect. Imagine a property of fair market value V, with a first mortgage balance of M and an

3   HOA lien with super-priority amount H1 and sub-priority amount H2. If the HOA forecloses,

4   and if the foreclosure extinguishes the first mortgage, the order of reimbursement will be

5   H1–M–H2. The first mortgagee is therefore no better off under the first mortgage rule in cases

6   where $V \geq H1 + H2 + M$, because in such cases the priority of reimbursement as between H2 and

7   M is of no consequence—the first mortgagee will be made whole in either case. The first

8   mortgagee is only better off under SFR Pool 1's interpretation of the first mortgage rule in cases

9   where $V < H1 + H2 + M$, because in such cases the first mortgagee's losses are limited to H1,

10  whereas without the first mortgage rule, the first mortgagee's losses would be H1 + H2. So SFR

11  Pool 1's interpretation of the statutes does retain some effect for the first mortgage rule. But the

12  effect is only seen in cases where the fair market value of the property at the time of foreclosure

13  is less than the amount due on the first mortgage or no more than a few thousand dollars more.

14  Although that circumstance is common today, it is not the historical norm, and it was not

15  common when the statutes were first adopted in 1991, over a decade before the real estate market

16  crash made "underwater" mortgages common. *See* 1991 Nev. Stat 535, 567–68.

17      The legislature cannot possibly have intended the super-priority rule to divest the equally

18  or more conspicuous first mortgage rule of any effect except in a class of cases that was rare

19  when the statutes were adopted. Not only would such an interpretation divest the first mortgage

20  rule of any significant application, it would cause an extreme result that the Court does not

21  believe the legislature intended in light of long-standing historical practice, including the practice

22  of the actors in the real estate market even after the statutes were adopted.[4]

23

24      [4]The Court also notes that the federal Contract Clause would likely be violated by any
    application of such a reading of the statutes, at least as to first mortgages recorded before the
25  statutes took effect.

1    The Court rejects SFR Pool 1's argument that an HOA lien necessarily extinguishes a

2    first mortgage because the HOA foreclosure statutes indicate, just as the general non-judicial

3    foreclosure statutes do, that foreclosure gives the purchaser title "without equity or right of

4    redemption." *Compare id.* § 116.31166(3), *with id.* § 107.080(5). These statutes have nothing to

5    do with the extinguishment of junior liens. It simply means, in both cases, that a defaulted owner

6    cannot redeem his default after the sale has occurred. These are simple and otherwise

7    uninteresting recitations of the ancient common law rule that a sale after default "forecloses"

8    (ends the possibility of) the "equity of redemption" (cure of the default). From here, SFR Pool 1

9    argues that it is indisputable that foreclosure of a senior lien extinguishes all junior liens. That is

10   of course true as a general matter, but if the statutes in this case work as Bayview argues they do,

11   and the Court believes they do, they work a twist on the general rule as between first mortgages

12   and HOA liens. *See supra.* SFR Pool 1 also argues that Bayview's position that foreclosure of an

13   HOA lien can never extinguish a first mortgage would render the last sentence of section

14   116.310312(4) meaningless. But this conclusion is both factually and legally wrong. Bayview

15   does not appear to argue, and the Court does not believe, that foreclosure of an HOA lien can

16   never extinguish a first mortgage. It seems plain that when delinquencies giving rise to an HOA

17   lien occur *before* a first mortgage is recorded, foreclosure of the resulting HOA lien extinguishes

18   the first mortgage, but SFR Pool 1 admits those circumstances are not present here.[5] Also, the

19   sentence at issue reads, "The lien may be foreclosed under NRS 116.31162 to 116.31168,

20   inclusive." *Id.* § 114.310312(4). A statute permitting foreclosure is not rendered meaningless

21   simply because another statute permits some other lien to survive such a foreclosure. The State

22   of Nevada may structure its foreclosure and priority laws however it sees fit. It may structure its

23   _____

24   [5]It appears undisputed that the DOT to Bayview's predecessor-in-interest was recorded on
     August 4, 2004, such that SFR Pool 1 is clearly not a bona fide purchaser protected from
     Bayview's interest by the recording statute, and Defendants admit that HOA dues did not become
25   delinquent until 2006.

1  laws to ensure that prior-recorded first mortgagees do not entirely lose their interest upon an

2  HOA foreclosure, while also ensuring that HOAs are protected for certain costs they have

3  incurred and up to nine months of delinquent fees.

4       In conclusion, the Court believes Bayview's interpretation of the statutes is correct.

5  Bayview's position appears to represent the dominant understanding of the actors in the real

6  estate market.  Bayview's interpretation also gives each section of the statutes significant

7  application and avoids an extreme result that was almost certainly not intended by the state

8  legislature, i.e., that the foreclosure of a small lien for even $1000 of delinquent HOA dues could

9  extinguish an earlier-recorded security interest on the order of hundreds of thousands of dollars,

10  when the purpose behind the super-priority statute was simply to ensure that HOA's are made

11  whole up to a certain amount.

12       Finally, even if HOOA's foreclosure had extinguished Bayview's first mortgage, that

13  would not end the matter here.  Bayview would still have been entitled to satisfy its first

14  mortgage out of the sale proceeds after satisfaction of the super-priority amount of HOOA's lien.

15  It therefore has standing to challenge the commercial reasonableness of the foreclosure sale, and

16  the sale for $10,000 of a Property that was worth $176,000 in 2004, and which was probably

17  worth somewhat more than half as much when sold at the foreclosure sale, raises serious doubts

18  as to commercial reasonableness. *See Levers v. Rio King Land & Inv. Co.*, 560 P.2d 917, 919–20

19  (Nev. 1977).

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

1

**CONCLUSION**

2          IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 33) is

3   GRANTED.  The mortgage of Bayview Loan Servicing, LLC against the Property at 5124 Lost

4   Canyon Dr., North Las Vegas, NV 89031 was not extinguished by the foreclosure sale at which

5   SFR Investments Pool 1, LLC obtained title to the Property.

6          IT IS FURTHER ORDERED that the Motion for Summary Judgment (ECF No. 35) is

7   DENIED.

8          IT IS FURTHER ORDERED that the Clerk shall enter judgment and close the case.

9          IT IS SO ORDERED.

10  Dated this 6th day of June, 2013.

11                                                         _____
                                                           ROBERT C. JONES
12                                                         United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25